UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

PRISCILLA ANN VAAGEN; NORMAN G.
LEBRET; ZACHARY LEBRET; SHANNON
L. WIDENER as Trustee of the
LEBRET CHILDREN EDUCATION TRUST
FOR LEBRET CHILDREN; WASHINGTON
STATE EMPLOYMENT SERVICES
DEPARTMENT; and SPOKANE COUNTY
TREASURER,

                    Defendants.

NO. CV-04-0269-EFS

**ORDER GRANTING IN PART AND
DENYING IN PART THE GOVERNMENT'S
MOTION FOR SUMMARY JUDGMENT**

On June 9, 2006, the Court conducted a telephonic hearing in the above-captioned case.  During the hearing, the Court heard oral argument on the Government's Motion for Summary Judgment Against All Remaining Defendants ("Motion for Summary Judgment") (Ct. Rec. 34).  At the conclusion of the hearing, the Court granted a portion of the Government's motion and took the remaining portion under advisement.  This Order serves to memorialize and supplement the Court's prior oral ruling and to formally deny the remaining portion of the Motion for Summary Judgment.

ORDER ~ 1

# I. Background[1]

In 1976 and 1980, Defendant Priscilla Ann Vaagen inherited property interests in Vaagen Bros. Lumber Co. when her mother and father respectively passed away. (Ct. Rec. 39-2 at 2.)  In 1986, Ms. Vaagen sold her interests in Vaagen Bros. Lumber Co. to an employee stock ownership plan for $1.2 million. *Id.* at 4.  Approximately $400,000.00 of the sale was collected by the Internal Revenue Service ("IRS") in taxes. *Id.*  The remaining $800,000.00 was placed in certificates of deposit ("Inheritance CDs") under an agreement in which routine interest payments and occasional principal payments were paid out to Ms. Vaagen. *Id.*

In 1982, prior to selling her interests in Vaagen Bros. Lumber Co., Ms. Vaagen and her husband at the time, Defendant Norman LeBret, gave birth to Defendant Zachary LeBret. *Id.* at 2.  In 1984 or 1985, Ms. Vaagen's family moved into a house located at 2310 North Upriver Court, Spokane, Washington (the "Upriver Court House") as renters. *Id.* However, in 1986, Ms. Vaagen began making payments to purchase the Upriver Court House with money obtained from her Inheritance CDs. *Id.* at 4.  Ms. Vaagen's family continued living in the Upriver Court House until 1987, when Ms. Vaagen used money from her Inheritance CDs to make a down

---

[1] In ruling on a motion for summary judgment, the Court considers the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1972) (*per curiam*).  The following factual recitation was created with this standard in mind.

ORDER ~ 2

payment on a different house. *Id.* at 4-5.  Thereafter, from 1987 to 1997, the Upriver Court House was rented out by Ms. Vaagen. *Id.* at 5.  During this ten year period, Ms. Vaagen fell behind on payments and property taxes associated with the Upriver Court House and foreclosure actions were instituted against her by the property's owner on several occasions. *Id.*

On July 14, 1989, Ms. Vaagen and Norman LeBret, as settlors, established the Education Trust for LeBret Children (the "Education Trust"). (Ct. Rec. 41-2 Ex. A at 1.)  The Education Trust was intended to assist their son, Zachary LeBret, with the financial costs of higher education. *Id.* at 2.  According to the trust agreement, the Education Trust is irrevocable and specifically states:

> This Agreement and the trusts hereby created shall be irrevocable and shall not be altered, amended, revoked, or terminated, in whole or in part, by the Settlors.  No part of the corpus or income of the trust estate shall ever revert to or be used for the benefit of the Settlors, . . . or be used to satisfy any legal obligations of the Settlors.

*Id.* at 13.

Over the course of the late-1980s and early-1990s, Ms. Vaagen used funds obtained from her Inheritance CDs to finance several failed business ventures her husband was involved in and to pay her and her husband's education expenses, which resulted in Norman LeBret obtaining a bachelor's degree after twelve years of full-time enrollment and Ms. Vaagen obtaining a law degree. *Id.*  Ms. Vaagen also used funds derived from her Inheritance CDs to gift money into the Education Trust. *Id.* at 6-7.  Ms. Vaagen believes at its highest point the Education Trust held approximately $60,000.00 to $70,000.00. *Id.*

ORDER ~ 3

1    In addition to money gifts made to the Education Trust, on two

2    occasions, Ms. Vaagen conveyed property interests in the Upriver Court

3    House to the Education Trust. (Ct. Rec. 34-6 Exs. B & C.)   The first

4    conveyance occurred in December 1992, when Ms. Vaagen conveyed an

5    undivided one-half interest in the Upriver Court House to the Education

6    Trust in consideration for "love and affection". *Id.* at Ex. B.   The

7    second conveyance occurred in December 1994, when Ms. Vaagen conveyed an

8    undivided one-quarter interest in the Upriver Court House to the

9    Education Trust, which was also made in consideration for "love and

10   affection". *Id.* at Ex. C.   Following these conveyances, Ms. Vaagen

11   retained ownership of a one-quarter interest in the Upriver Court House.[2]

12   Ms. Vaagen indicates she intended to eventually gift the entire house to

13   the Education Trust and that the decision to gift the property in pieces

14   was driven by the tax implications associated with gifting the entire

15   house at one time. (Ct. Rec. 39-2 at 7.)   In addition, Ms. Vaagen

16   explains that the remaining one-quarter property interest was not gifted

17   to the Education Trust due to neglect and because she ultimately did not

18   have the funds to do so. *Id.*

19    In 1993, Ms. Vaagen became a licensed attorney in Washington State.

20   *Id.* at 8.  In early-1994 through 1995, Ms. Vaagen worked for Tim Harkins,

21   who is a Spokane-area attorney. *Id.*  Ms. Vaagen claims her job with Mr.

22   Harkins paid approximately $24,000.00 per year and that because she could

---

23

24   [2] Ms. Vaagen indicates she believes she made a third conveyance of

25   the Upriver Court House to the Education Trust, but explains she has no

26   evidence of the transfer and does not know what portion of the property

was conveyed in the purported third conveyance. (Ct. Rec. 39-2 at 7.)

ORDER ~ 4

not afford her living costs and make the property payments she owed on that salary, she continued to spend her "savings and assets to survive." *Id.* Ms. Vaagen also implies that her ability to support herself was also negatively impacted by her separation and divorce from Norman LeBrent in 1995. *Id.* Ms. Vaagen has never filed Individual Federal Income Tax Returns (Form 1040) for the years of 1993 and 1995. (Ct. Rec. 34-5 ¶ 7.)

In 1996, Ms. Vaagen began working for a different attorney, but claims she still was not making enough money to survive and that she "may have" lived off of money taken from the Education Trust. (Ct. Rec. 39-2 at 9.) After six months of working for the new attorney, Ms. Vaagen was laid off. *Id.* At that point, in mid-1997, Ms. Vaagen opened her own legal practice in Spokane. *Id.* at 9-10. Although Ms. Vaagen indicates she was able to build up a clientele, she continued to be unprofitable due to poor billing practices. *Id.* at 10. Ms. Vaagen did not file Employer's Annual Federal Unemployment Tax Returns (Form 940) for her law practice in 1997, 1999, or 2000. (Ct. Rec. 34-5 ¶ 8.) Additionally, Ms. Vaagen did not file Employer's Quarterly Federal Tax Returns (Form 941) for her law practice for more than half of the business quarters between 1998 and 2002, nor did Ms. Vaagen pay the taxes associated with these returns for the quarters in which they were filed between 1998-2002. *Id.* at ¶ 9.

Due to the mounting financial burdens associated with her legal practice, Ms. Vaagen moved herself and her son back to the Upriver Court House in 1997. In addition, Ms. Vaagen indicates that over several years, she pulled out most of the money held in the Education Trust and borrowed it to pay for business expenses and to get the Upriver Court

House out of foreclosure, pay property taxes, and to pay the final $17,000.00 payment on the house. *Id.* Ms. Vaagen also explains that in 2000 or 2001, $6,000.00 of funds held by the Education Trust were used to pay back funds that were missing from her client trust account. *Id.*

In 2000, after graduating from high school, Zachary LeBret moved out of the Upriver Court House and began working in Ms. Vaagen's law office because he had not been accepted into college. *Id.* After Zachary LaBret moved out, Ms. Vaagen continued living in the Upriver Court House until May 2002, when she moved out for two years. *Id.* at 11. Ms. Vaagen now resides in the Upriver Court House again. *Id.*

In 2002, Zachary Vaagen began attending college. *Id.* During his first year, Zachary Vaagen spent all of the money remaining in the Education Trust for school expenses. *Id.* In order to cover her son's future education costs, Ms. Vaagen determined she would have to sell the Upriver Court House. *Id.* However, at that point, Ms. Vaagen discovered she would be unable to sell the house due to a number of tax liens that had been placed on it by the federal government and Spokane County. *Id.* Zachary LeBret has since borrowed money through federal student loans and from Ms. Vaagen's sister to cover education costs. *Id.*

Between 1997 and 2002, the Secretary of the Treasury completed assessments on the unpaid income and business taxes owed by Ms. Vaagen and her law practice. (Ct. Rec. 34-4 Ex. 1.) The following chart outlines the amount in taxes, penalties, interest, and costs the Government believes Ms. Vaagen owes to the IRS:

///

///

ORDER ~ 6

| Type of Tax | Tax Period | Assessment Date | Unpaid Balance of Assessments | Balance Due With Interest |
|---|---|---|---|---|
| Form 1040 | 1993 | 09/29/97 | $28,056.83 | $47,195.74 |
| Form 1040 | 1995 | 11/17/97 | $31,291.09 | $51,689.22 |
| Form 940 | 12/31/97 | 01/07/02 | $187.63 | $258.52 |
| Form 940 | 12/31/99 | 01/07/02 | $2,985.33 | $4,203.32 |
| Form 940 | 12/31/00 | 01/07/02 | $985.75 | $1,371.88 |
| Form 941 | 03/31/98 | 12/31/01 | $3,306.59 | $0.00 |
| Form 941 | 06/30/98 | 12/31/01 | $3,204.21 | $4,392.95 |
| Form 941 | 09/30/98 | 12/31/01 | $3,041.89 | $4,175.07 |
| Form 941 | 12/31/98 | 04/05/99 | $0.00 | $185.82 |
| Form 941 | 03/31/99 | 12/31/01 | $4,484.90 | $6,284.79 |
| Form 941 | 06/30/99 | 12/31/01 | $4,403.25 | $6,182.33 |
| Form 941 | 09/30/99 | 12/31/01 | $4,323.25 | $6,081.90 |
| Form 941 | 12/31/99 | 12/31/01 | $4,244.89 | $5,983.59 |
| Form 941 | 09/30/00 | 12/03/01 | $1,630.85 | $2,239.95 |
| Form 941 | 12/31/00 | 12/03/01 | $2,843.63 | $3,947.99 |
| Form 941 | 03/31/01 | 09/17/01 | $2,377.52 | $3,472.32 |
| Form 941 | 06/30/01 | 09/10/01 | $968.56 | $1,471.97 |
| Form 941 | 09/30/01 | 09/10/01 | $1,420.31 | $2,124.53 |
| Form 941 | 03/31/02 | 07/08/02 | $1,346.79 | $1,937.05 |
| Form 941 | 06/30/02 | 09/23/02 | $1,420.22 | $1,997.76 |
| | | | *TOTAL DUE:* | *$155,196.70*[3] |

*Id.* at 3.

Certificates of Assessments, Payments and Other Specified Matters ("Certificates of Assessments") for each of Ms. Vaagen's Form 1040, 940, and 941 unpaid tax periods have been created by the IRS and submitted to

---

[3]  The interest and other statutory accruals were calculated on March 17, 2006. and may now be higher. (Ct. Rec. 34-4 at 3.)

the Court in connection with Plaintiff's Motion for Summary Judgment. (Ct. Rec. 34-5 Exs. F-1, F-2, G-1, G-2, G-3, H-1, H-2, H-3, H-4, & H-5.) The Certificates of Assessments detail the amount in taxes the IRS believes Ms. Vaagen owes for each of the delinquent tax periods, as well as any penalties, costs, and interest assessed to Ms. Vaagen due to her failure to make timely tax payments. *Id.*

Notices of Federal Tax Liens on the Upriver Court House for each of the above-listed tax delinquencies were recorded by the IRS with the Spokane County Auditor in October 2001, February 2002, and August 2002. *Id.* at Exs. I-1, I-2, J-1, & J-2. To date, Ms. Vaagen has failed to pay any of the $155,196.70 (plus interest) the IRS claims it is owed in past due taxes. For this reason, the Government filed this action in an attempt to reduce Ms. Vaagen's federal tax assessments to judgment against Ms. Vaagen and to foreclose their purported federal tax liens on the Upriver Court House as a means of satisfying such judgment. (Ct. Rec. 1.) Norman LeBret, Zachary LeBret, the Education Trust, Washington State Employment Services Department, and Spokane County Treasurer[4] were all named as Defendants due to the potential interests they may have in the Upriver Court House. *Id.*

On May 26, 2005, an Order of Default was entered by the Clerk of the Court as to Defendant Washington State Employment Services Department because no Answer had been filed on its behalf. (Ct. Rec. 20.) In addition, on September 29, 2005, an Order dismissing the Spokane County

---

[4] On May 20, 2005, the Spokane County Treasurer was substituted in for the Spokane County Assessor, which had been originally named as a defendant in the Government's Complaint. (Ct. Rec. 15.)

ORDER ~ 8

Treasurer was entered in which the Court recognized the Spokane County Treasurer's and Government's joint belief that the Spokane County Treasurer's *ad valorem* property tax liens on the Upriver Court House are entitled to priority over the United States' federal tax liens. (Ct. Rec. 31 at 1.)   For this reason, the proceeds from any future sale of the Upriver Court House must first be paid to the Spokane County Treasurer to satisfy the unpaid balance of any existing *ad valorem* property taxes owed on the Upriver Court House. *Id.* at 2.   Thus, the only remaining Defendants are Ms. Vaagen, Norman LeBret, Zachary LeBret, and the Education Trust - all of whom are represented by Michael Beyer and jointly oppose the Government's Motion for Summary Judgment. (Ct. Rec. 39.)

## II. Standard of Review

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).   When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id*. at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under

ORDER ~ 9

1  the governing law." *Id.*   There is no genuine issue for trial if the

2  evidence favoring the non-movant is "merely colorable" or "not

3  significantly probative." *Id.* at 249.

4       If the party requesting summary judgment demonstrates the absence

5  of a genuine material fact, the party opposing summary judgment "may not

6  rest upon the mere allegations or denials of his pleading, but . . . must

7  set forth specific facts showing that there is a genuine issue for trial"

8  or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248.

9  This requires the party opposing summary judgment to present or identify

10 in the record evidence sufficient to establish the existence of any

11 challenged element that is essential to that party's case and for which

12 that party will bear the burden of proof at trial. *Celotex Corp. v.*

13 *Catrett*, 477 U.S. 317, 322-23 (1986).   Failure to contradict the moving

14 party's facts with counter affidavits or other responsive materials may

15 result in the entry of summary judgment if the party requesting summary

16 judgment is otherwise entitled to judgment as a matter of law. *Anderson*

17 *v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

18                        **III. Analysis**

19      The Government moves the Court for an order that (1) reduces its tax

20 assessments to judgment against Ms. Vaagen; (2) finds it has an effective

21 tax lien on all interests in the Upriver Court House; and (3) permits it

22 to foreclose on and sell the Upriver Court House to satisfy outstanding

23 federal and Spokane County tax debts.   Each of these issues is separately

24 addressed below.

25 ///

26 ///

ORDER ~ 10

**A. Reducing Ms. Vaagen's Federal Tax Assessments to Judgment**

The Secretary of the Treasury

is authorized and required to make the inquiries, determinations, and assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by [statute], or accruing under any former internal revenue law, which have not been duly paid by stamp at the time and in the manner provided by law.

26 U.S.C. § 6201(a). Assessments made pursuant to § 6201(a), "shall be made by recording the liability of the taxpayer in the office of the Secretary [of the Treasury] in accordance with the rules or regulations prescribed by the Secretary [of the Treasury]." *Id.* § 6203. IRS Form 4340, which outlines the delinquent amount of taxes owed by a particular taxpayer for a certain time period and the interest and penalties assessed thereto, serves as presumptive evidence that a tax has been validly assessed under § 6203.[5] *Huff v. United States*, 10 F.3d 1440, 1445-46 (9th Cir. 1993); *Farr v. United States*, 990 F.2d 451, 454 (9th Cir. 1993); *Hughes v. United States*, 953 F.2d 531, 540 (9th Cir. 1991).

After assessing a tax pursuant to § 6203, the Secretary of the Treasury must "give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof." 26 U.S.C. § 6303(a). Official documents, such as IRS Form 4340, "in the absence of contrary evidence, are sufficient to establish that notices . . . were properly made." *Hughes,* 953 F.2d at 540 (citing *United States v. Zolla*, 724 F.2d 808, 810 (9th Cir. 1984)).

---

[5] IRS Form 4340 is commonly known as a Certificate of Assessments, Payments, and other Specified Matters ("Certificate of Assessments").

ORDER ~ 11

"In an action to collect taxes, the government bears the initial burden of proof." *Palmer v. United States Internal Revenue Serv.*, 116 F.3d 1309, 1312 (9th Cir. 1997) (citing *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983), *cert. denied*, 465 U.S. 1079 (1984)). However, "assessments for unpaid taxes are normally entitled to a presumption of correctness so long as they are supported by a minimal factual foundation." *Id.* This presumption of correctness "shifts the burden of proof to the taxpayer to show that the determination is incorrect." *Id.*; *Rapp v. Comm'r*, 774 F.2d 932, 935 (9th Cir. 1985).

In this case, the Government offers Certificates of Assessments for each time period it claims Ms. Vaagen owes taxes. (Ct. Rec. 34 Exs. F-1, F-2, G-1, G-2, G-3, H-1, H-2, H-3, H-4, & H-5.) The Certificates of Assessments serve as presumptive evidence that Ms. Vaagen's taxes were validly assessed by the IRS under § 6203 and that she was given notice of and demanded to pay the assessments in accordance with § 6303(a). *See Huff*, 10 F.3d at 1445-46; *Hughes*, 953 at 540. Accordingly, a presumption of correctness has arisen that the IRS' tax assessments of Ms. Vaagen are correct and that she must pay the money claimed in the Certificates of Assessments to be due. *See Palmer*, 116 F.3d at 1312.

Although the correctness of the IRS' assessments is not challenged in the Memorandum of Authorities of Defendants in Opposition to the Motion for Summary Judgment of Plaintiff ("Defendants' Response") (Ct. Rec. 39-1), statements contained in the First Declaration of Priscilla A. Vaagen in Opposition to the Motion for Summary Judgment of Plaintiff United States appear to question the veracity of the assessments associated with Ms. Vaagen's unpaid income tax in 1993 and 1995 (Ct. Rec.

39-2).  In general, although Ms. Vaagen agrees she did not pay income tax in 1993 or 1995, she claims the IRS did not take into account certain deductions she believes she was eligible to receive in 1993 and 1995. Specifically, Ms. Vaagen states:

> The government has not shown any credit for the taxes paid by Mr. Harkins.  I do not owe the monies as represented by the government for the tax years 1993 and 1995.  There are numerous items that are deductible such as business expenses some of which are identified by the attached checks.  I believe there were thousands of dollars deductible for business expenses. Zach was still a minor and there where (sic) exemptions available for him and Norman and myself.  . . .   I had significant medical deductions for the subject tax years. There are interest deductions available and possible earned income credit.   The government has not provided for the available credits, exemption and deductions.

*Id.* at 8-9.

Despite Ms. Vaagen's reference to "attached checks," no documentary evidence or legal argument was offered to support Ms. Vaagen's above-stated claims.   Accordingly, Ms. Vaagen's claims of incorrect tax assessment are merely conclusory allegations, which are insufficient to defeat the Government's request for summary judgment on the issue of whether the amounts assessed by the IRS are due by Ms. Vaagen. *See Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the nonmoving party relies on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual date to create an issue of material fact.") (citations omitted).

Accordingly, because Defendants have offered insufficient evidence to rebut the presumption of correctness arising from the Certificates of Assessments submitted by the Government, the Court grants this portion of the Government's motion by finding the assessment amounts listed in

ORDER ~ 13

the above-produced chart are owed by Ms. Vaagen and reduces said amounts to judgment in favor of the Government.

**B. Federal Tax Liens**

Section 6321 of Title 26 of the United States Code provides:

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or property, belonging to such person.

Under § 6321, liens automatically arise in favor of the Government when taxpayers fail to pay federal taxes after they become due and are demanded. *See United States v. Vermont*, 377 U.S. 351, 355 (1964).

Because Ms. Vaagen failed to pay federal taxes that were due and demanded, a lien arose in favor of the Government in all property Ms. Vaagen owns. 26 U.S.C. § 6321. Therefore, the Court finds the Government has an effective § 6321 lien on the one-quarter interest of the Upriver Court House expressly deeded in Ms. Vaagen's name.

However, remaining in dispute is the issue of whether the Government has a legitimate § 6321 lien on the remaining three-quarter interest in the Upriver Court House, which was conveyed to the Education Trust by Ms. Vaagen in 1992 and 1994. The Government claims that a § 6321 lien exists on the remaining three-quarters of the property under the separate theories of nominee ownership and fraudulent conveyance. Defendants oppose these arguments by asserting the remaining three-quarter interest is rightly owned by the Education Trust and not Ms. Vaagen. The Government's separate theories are discussed below.

///

ORDER ~ 14

**1. Nominee Theory**

Section 6321 liens attach to property held by a delinquent taxpayer's nominees so long as the delinquent taxpayer is the equitable owner of the property. *See generally G. M. Leasing Corp. v. United States,* 429 U.S. 338, 351 (1977) (accepting lower court's determination that tax assessments may be satisfied by seizing property technically owned by the delinquent taxpayer's alter ego corporate identity); *Wolfe v. United States,* 798 F.2d 1241, 1245 (9th Cir. 1986), *cert. denied,* 482 U.S. 927 (1987); *United States v. Marsh*, 168 F. Supp. 2d 1036, 1045 (2000); *Shades Ridge Holding Co., Inc. v. United States,* 888 F.2d 725, 728-729 (11th Cir. 1989), *cert. denied,* 494 U.S. 1027 (1990) ("Property of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability."); *Loving Saviour Church v. United States,* 728 F.2d 1085 (8th Cir. 1984). The Government has the burden of proving by a preponderance of the evidence that certain property is being held by a delinquent taxpayer's nominee. *United States v. Reed,* 168 F. Supp. 2d 1266, 1268 (D. Ut. 2001); *Marsh,* 114 F. Supp. 2d at 1045.

When applying a federal tax law, such as § 6321, "state law controls in determining the nature of the legal interest which the taxpayer had in the property." *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 722 (1985). Here, because the Government has identified no Washington State law addressing the issue of when a trust should be treated as a nominee of a delinquent taxpayer, it urges the Court to look to standards applied by other federal courts in similar situations. Specifically, the Government points to the analysis found in *Towe Antique Ford Foundation*, which outlines six factors a District of Montana court found to be

relevant when determining whether a business entity is the nominee of an individual. 791 F. Supp. 1450 (D. Mont), *aff'd,* 999 F.2d 1387 (9th Cir. 1993) .  These six factors include:

> (a) No consideration or inadequate consideration paid by the nominee;
>
> (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;
>
> (c) Close relationship between transferor and the nominee;
>
> (d) Failure to record conveyance;
>
> (e) Retention of possession by transferor; and
>
> (f) Continued enjoyment by the transferor of benefits of the transferred property.

*Id.; United States v. Miller Bros. Constr. Co.*, 505 F.2d 1031 (10th Cir. 1974); *United States v. Bell*, 27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998)*; United States v. Williams*, 581 F. Supp. 756, 759 (N.D. Ga. 1982); *United States v. Code Prod. Corp.*, 216 F. Supp. 281 (E.D. Pa. 1963).  Defendants summarily oppose the use of the factors outlined in *Towe Antique Ford Foundation* because they are not derived from Washington State law. Despite this opposition, Defendants fail to refer the Court to any Washington State standards they believe are more appropriate to the consideration of whether the Education Trust is serving as Ms. Vaagen's nominee with regard to the Upriver Court House property.

Because (1) the Court has found no controlling Washington law on the issue at bar, (2) Defendants offered no alternative standard for the Court to apply, and (3) the Court believes the factors outlined in *Towe Antiques Ford Foundation*, a case upheld by the Ninth Circuit, adequately address the issues relevant to determining whether a taxpayer is using

1  a trust as a nominee to shield property from collection, the Court adopts

2  the six-factor analysis applied in *Towe Antique Ford Foundation* for use

3  in this case.

4      Although the *Towe Antique Ford Foundation* analysis offered by the

5  Government has been adopted for use in this case, the Court nevertheless

6  must deny the Government's nominee theory-based summary judgment request.

7  As summarized below, despite the volume of evidence offered by the

8  Government to demonstrate the Education Trust holds the Upriver Court

9  property as a nominee of Ms. Vaagen, a limited amount of evidence offered

10  by Defendants supports the opposite conclusion. Accordingly, a material

11  issue of fact exists regarding the Education Trust's nominee status and

12  summary judgment is not appropriate.

13      In support of its position that the Education Trust should be

14  declared Ms. Vaagen's nominee under the six-factor *Towe Antique Ford*

15  *Foundation* analysis, the Government offers the following evidence: (1)

16  no consideration was paid by the Education Trust to Ms. Vaagen for the

17  two Upriver Court property conveyances; (2) after gifting money into the

18  trust, Ms. Vaagen repeatedly took the money back out to cover costs not

19  associated with Zachary LeBret's education, e.g. business costs, to repay

20  her client trust fund, etc.; (3) the final $14,000.00 house payment was

21  made using money from the trust, which resulted in Ms. Vaagen not having

22  to pay her remaining one-quarter share of the remaining house payments;

23  (4) despite the trust's alleged "irrevocable" nature, Ms. Vaagen appears

24  to have retained control over how its corpus was used; (5) despite the

25  existence of a trustee, there is no evidence the trustee exercised any

26  control over the trust's investments or corpus; (6) one-quarter of the

Upriver Court House was conveyed to the Trust in 1994 after Ms. Vaagen failed to file or pay federal income taxes in 1993, which supports a finding that she was attempted to shield the property from tax liability; (7) the close relationships between Ms. Vaagen (settlor), Shannon Widner (trustee and Ms. Vaagen's niece), and Zachery LeBret (beneficiary and Ms. Vaagen's son); and (8) despite the fact that Ms. Vaagen only owns a one-quarter interest in the Upriver Court House, there is no evidence that she has been paying any form of rent to the trust for her continued use of the house, which has continued to the current date even though Zachary moved out of the Upriver Court House in 2000 after graduating from high school.

The Government's evidence is countered by the following evidence by Defendants: (1) because the Education Trust was intended to serve a charitable purpose, one would not expect an exchange of consideration when the two Upriver Court property conveyances were made by Ms. Vaagen; (2) money was used from the trust to pay taxes owed on the Upriver Court House, which the trust owes a majority share in; (3) Ms. Vaagen owes a one-quarter share in the house and should be entitled to make use of the house; (4) Ms. Vaagen claims to have paid for house repairs and certain taxes in exchange for the right to live in the Upriver Court House; and (5) had Ms. Vaagen intended her conveyances to have been a means of protecting the house from tax liability, she would have conveyed her full interest in the property.

As noted above, the evidence, and inferences reasonably drawn therefrom, are at odds and demonstrate the existence of a material issue of fact regarding the Education Trust's status as Ms. Vaagen's alleged

nominee.  For this reason, this portion of the Government's Motion for Summary Judgment is denied.

### 2. Fraudulent Conveyance Theory

Under Washington law,

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

R.C.W. § 19.40.051(a).  If a transfer or obligation is found to be fraudulent under R.C.W. § 19.40.051(a), a creditor may avoid "the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 19.40.71(a)(1).

The Government now moves the Court for summary judgment on the issue of whether Ms. Vaagen fraudulently conveyed three-quarters of the Upriver Court House to the Education Trust under R.C.W. § 19.40.051(a). Defendants oppose the Government's request by arguing that a genuine issue of material issue exists regarding whether Ms. Vaagen intended to defraud the Government by way of her conveyances.  Despite Defendants' insistence on this point and the Government's failure to refute it, this argument is meritless because R.C.W. § 19.40.051(a) does not require a showing that Ms. Vaagen intended to defraud the Government via her conveyances.

However, because the Government has failed to provide any evidence that Ms. Vaagen was insolvent or became insolvent as a result of her second conveyance in 1994, after she had incurred the debt associated with her failure to pay income taxes in 1993, the Government is not

entitled to judgment as a matter of law on this issue.  For this reason, the Court denies the Government's request for summary judgment on this issue.

### IV. Conclusion

The Court grants in part the Government's Motion for Summary Judgment by (1) reducing the assessments outlined above to judgment in favor of the Government and (2) finding the Government has an effective lien on Ms. Vaagen's one-quarter interest in the Upriver Court House. Nevertheless, the Court denies in part the Government's Motion for Summary Judgment by finding (1) genuine issues of material fact exist regarding whether the Education Trust holds the remaining three-quarter interest in the Upriver Court House as Ms. Vaagen's nominee and (2) the Government has failed to establish the essential elements of its fraudulent conveyance claim.

Accordingly, **IT IS HEREBY ORDERED:** The Government's Motion for Summary Judgment **(Ct. Rec. 34)** is **GRANTED IN PART** (tax assessments reduced to judgment & finding of an effective tax lien on a one-quarter interest in the Upriver Court House) and **DENIED IN PART** (nominee and fraudulent conveyance theories).

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide a copy to counsel.

**DATED** this 22nd     day of August 2006.


            S/ Edward F. Shea
               EDWARD F. SHEA
         United States District Judge


Q:\Civil\2004\0269.MSJ.wpd

ORDER ~ 20